# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **WILLIAM BARBER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 24-00046-JB-C** |
| | ) | |
| **USA HEALTH CARE MANAGEMENT LLC, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This action is before the Court on Defendants USA HealthCare Management LLC ("USA HCM") and the University of South Alabama's ("USA") (collectively "USA Health") Motion for Summary Judgment (Doc. 51), Plaintiff William Barber's ("Barber") response (Doc. 55), and Defendants' reply (Doc. 56). A hearing was held on September 15, 2025, with counsel for both parties present. After careful consideration of the relevant filings and for the reason stated herein below, Defendants' Motion is **GRANTED**.

## I.      Summary of Undisputed Material Facts[1]

**Dr. Barber's Employment and Job Duties.**

Plaintiff William Barber worked as a trauma/critical care surgeon at USA Health University Hospital, beginning in 2011. At the time of his termination, Dr. Barber's employment was governed by the Physician Employment Agreement between him and USA HCM dated October

---

[1] Barber specifically adopted the narrative facts presented by Defendants. (*See* Doc. 55 at 3, n. 1). As a result, for the sake of judicial economy, the Court restates the facts set forth by Defendants in full and with only minor non-substantive changes. Accordingly, unless otherwise cited, all facts are derived from Doc. 51 with footnotes and internal citations omitted.

1, 2020. Per that agreement, Dr. Barber was employed to be a Trauma/Surgery Critical Care physician and Professor in the Department of Surgery, and he was required to obtain and maintain clinical privileges at the University's hospital facilities as necessary for him to perform all services required under the agreement for its duration.

Dr. Barber was hired to be and served as a trauma surgeon, which involves treating anyone who presents to the hospital with a traumatic mechanism, to perform those operations, and to care for the patients while they are in the hospital. Other trauma/critical care duties included covering service lines including emergency general surgery (EGS), burns, neurological ICU, surgical ICU, and trauma ICU.  Trauma/critical care surgeons are required to take night and weekend call during which they are the only attending trauma/critical care surgeon at the hospital covering all of these service lines.

Dr. Barber had academic duties in addition to clinical duties, as University Hospital is a teaching hospital, and so he was responsible for educating medical students and residents in the hospital setting. Dr. Barber supervised all levels of residents in a five-year surgical residency program, teaching them the full range of trauma critical care surgeries that Dr. Barber was responsible for performing. As the attending physician, one or more residents would assist him with a given procedure, but he was ultimately responsible for the care of the patient. According to Dr. Barber's deposition testimony, each trauma surgery typically takes 60-90 minutes, standing at the patient the entire time. While Dr. Barber generally denies that surgeries ever took longer, Dr. Jon Simmons, Division Chief of Trauma, Acute Care Surgery and Burns, testified that they could take up to eight hours. Dr. Simmons also testified that when he is on call he can be on his feet for 16 hours.

Dr. Barber was typically assigned to work the Emergency General Surgery (EGS) service at University Hospital, and a few days a month of night or weekend call when he was the only attending trauma surgeon in the hospital covering all trauma/critical care service lines. Call shifts can last up to 36 hours. EGS involved non-traumatic surgical emergencies that needed to be completed within 24 hours, but typically would also encompass trauma procedures, where a patient is evaluated for an emergency operation immediately upon arrival. Dr. Barber was typically assigned three weeks a month of EGS service plus a few weekend or night call shifts.

Dr. Barber started a wound care service at University Hospital, in response to concerns regarding the piecemeal care of wounds in the hospital by various providers. Dr. Barber was Medical Director for the wound care service (or "program"), one of several titles used for USA Health physicians that have duties auxiliary to patient care. According to Dr. Barber's deposition testimony, he thinks he started the wound care service before 2020. Dr. Barber testified that he was the primary surgeon involved in dealing with those patients, as well as medical residents and a nurse practitioner who was the primary provider. Dr. Barber's role was to advise and have oversight of patients who were seen by the wound service; the nurse practitioner was the provider responsible for treating the patients. From Dr. Simmons's perspective, Dr. Barber's wound care duties accounted for approximately 25% of his time and was a secondary part of his job. On weeks that he was on the EGS service, Dr. Barber also performed Medical Director duties. Starting in February 2022, Dr. Barber had one week of EGS per month on average, and a few days of night or weekend call. Dr. Barber alleges that he was told by Dr. Simmons that wound care was his most important job function or what he should spent the most time on; Dr. Simmons denies saying this and testified that he never told Dr. Barber that he should spend the majority of his

time on wound care. Every surgeon in the division has a supervisory or administrative role, such as over medical education or other service lines, in addition to their clinical care responsibilities. Moreover, as set forth above, Dr. Barber does not dispute that he continued to have EGS and other trauma/critical care duties while serving as the wound care Medical Director.

### Dr. Barber's Hospitalization and Beginning of Leave

In mid-October 2022, Dr. Barber underwent hip replacement surgery. Dr. Barber expected to be out of work for only 10 days after that procedure but does not recall when or if he returned to work after that October procedure. On November 13, 2022, he reported to the Emergency Department at University Hospital complaining of trouble breathing and was treated over the course of a few days. Then, on December 19, he returned to the Emergency Department and had a laminectomy of L1 for spinal epidural hematoma that same day by a neurosurgeon. He transitioned to inpatient rehabilitation but had to return to the hospital in early January and had an additional laminectomy and treatment for infection. Dr. Simmons reported to disability carriers that as of early January 2023 Dr. Barber was experiencing severe lower extremity weakness and paresis and was unable to stand without maximum assistance. At the time, Dr. Simmons was concerned that Dr. Barber may never walk again, and not be able to function as a physician, particularly due to his inability to stand due to the paresis. As described by Dr. Barber in his response to an interrogatory, he suffered recurring lumbar spine pain as a result of his complications, began showing significant signs of recovery in April 2023, and at minimum could have performed his duties as Medical Director of the wound care service by June 2023.

Dr. Barber does not recall seeking a leave of absence from the University or applying for disability benefits, but acknowledges and does not dispute that he was placed on leave and that

he applied for and received disability benefits. He also took FMLA leave. Dr. Simmons assisted with Dr. Barber's application for disability benefits as he was the admitting physician during Dr. Barber's December 2022 – January 2023 hospital admissions.

On January 3, 2023, the Medical Staff office sent an email and letter to Dr. Barber acknowledging his medical leave, directing him to not exercise any of his clinical privileges, setting forth the procedure for applying for reinstatement of privileges, and providing relevant excerpts from the Practitioner Health Policy and the Medical Staff Credentials Policy.

**Process for Reinstatement to the Medical Staff**

All physicians must maintain hospital privileges as part of the Medical Staff at USA Health's hospitals (University Hospital and Children's & Women's Hospital) to treat patients at those facilities, pursuant to the University's Medical Staff policies. Physicians on the Medical Staff must undergo a process for reinstatement when they return from a medical leave. To be reinstated, a physician must submit a written request for clearance to apply for reinstatement and be granted written permission. A practitioner must also submit a written summary of their professional activities during the leave, and any other information that may be requested by the hospital. When the leave of absence is for health reasons (other than maternity leave), the request for reinstatement must be accompanied by a report from the individual's physician indicating that the individual is physically and/or mentally capable of resuming a hospital practice and safely exercising the clinical privileges requested. The Leadership Council may request any additional information or documentation that it believes is necessary to evaluate the practitioner's ability to safely and competently exercise clinical privileges, which may include requiring the Practitioner to undergo a health assessment conducted by a physician or entity chosen by the

Leadership Council to obtain a second opinion on the Practitioner's ability to practice safely and competently.

Requests for reinstatement are reviewed by the relevant department chair or service line chair, the Chair of the Combined Credentials Committee, the Chair of the Medical Executive Committee (MEC), and the Chief Medical Officer (CMO) (collectively known as the Leadership Council for the relevant hospital, or the Joint Leadership Council if the physician is on the Medical Staff of University Hospital and Children's & Women's Hospital, as Dr. Barber was). The Joint Leadership Council is the first step in determining whether the practitioner is capable of practicing safely and competently. The Leadership Council determination is forwarded to the Combined Credentials Committee, MEC and Board for review and recommendation. If a request for reinstatement is not granted, for reasons related to clinical competence or professional conduct, the individual shall be entitled to request a hearing and appeal.

**Dr. Barber's Efforts to be Reinstated to the Medical Staff and Return From Leave**

Dr. Barber first reached out to Sharon Ezelle and Juliana Kuck ("Kuck") in the Medical Staff office for information on how to reinstate his hospital privileges in an email on February 11, 2023. He expected to be discharged from the rehabilitation center on February 17 and anticipated returning to work February 27, 2023. Kuck responded on February 14, acknowledging that he was requesting reinstatement and informing Dr. Barber that he would need to go for a fit-for-duty evaluation with Dr. Robert Ross ("Dr. Ross"), in the industrial medicine group who runs the Industrial Medicine/Occupational Health Program. Kuck also provided Dr. Barber with his privileges checklist to be used to evaluate whether he was ready to return to work. Dr. Barber reported to Dr. Chang and Dr. Simmons on February 17 that he was home from the rehabilitation

facility and there were no issues so far. At the time Dr. Barber was discharged, he could only stand for ten minutes at a time.

On February 27, 2023, Kuck emailed Dr. Barber requesting that he send a written letter to the Medical Staff office formally notifying them of his request for reinstatement accompanied by a Health Status Assessment Form to be completed by Dr. Barber's treating physician, which was provided to Dr. Barber along with his privileges checklist. Dr. Chang emailed Dr. Barber on February 28 to tell him that he asked Ezelle and her team to direct Dr. Barber towards a physician who could attest to his spine condition, at that was the root of his most recent hospitalization and rehabilitation. Dr. Chang also offered for Dr. Barber to see Dr. Ross in Industrial Medicine/Occupational Health. Dr. Barber responded that he was concerned that Dr. Ross is not familiar with his role or physical duties with the wound service, and the following day told Dr. Chang that he could direct the wound service, but with no mention of his surgical duties.

Dr. Barber emailed Dr. Ross on March 1, 2023, requesting a duty evaluation. Dr. Barber also emailed one of his treating neurosurgeons, Dr. Anthony Martino, on March 2, 2023. Ezelle acknowledged that same day to Dr. Barber that the office had received a completed health assessment form and requested from Dr. Barber a written summary of his activities during leave and the date he was requesting to be reinstated. Dr. Barber provided an email summary the following day and referenced documentation of fitness from Dr. Martino and Dr. Trammell. Ezelle followed up asking for Dr. Trammell's assessment and Dr. Barber said that it was forthcoming, but Dr. Trammell did not provide one. Ezelle also sent Dr. Barber information regarding the procedure for his reinstatement to the medical staff.

In Early April 2023, Dr. Barber corresponded with Ansleigh Townsend in Human Resources,

stating that he could perform the wound service duties, and she directed him to get Dr. Martino to provide a return-to work release, and he asked Dr. Martino to do so. Dr. Barber also emailed Dr. Simmons saying that he was ready to return to the wound service, with no mention of surgery. Dr. Simmons added Dr. Chang to the email chain, who shared with Dr. Barber that a leadership group met on March 29 to review the information from Dr. Martino and his privileges, and that due to questions raised at the meeting, the Leadership Council would be assembled to discuss these questions and make recommendations about next steps. Dr. Chang also noted that employment matters related to his leave and long-term disability are not related to the Medical Staff process regarding privileges.

Also in April 2023, Dr. Barber met with Fox, Ms. Townsend, and Chief Human Resources Officer Andrea Rosler to discuss his plans. Fox wanted to meet with Barber to determine his intentions regarding a return to work.  Dr. Barber shared with them that his intent was to continue to seek both long-term disability and also to return to work, which was contradictory to Fox and Barber did not resolve that contradiction.  Fox informed Dr. Barber that he needed to have his hospital privileges reinstated before he could return to work.

The Joint Leadership Council met again on May 4, 2023. The Council discussed Dr. Martino's report and that it was vague and focused more on his months-prior surgical procedure than on Dr. Barber's functional abilities. They recommended that Dr. Barber receive a third-party evaluation for his functional ability to perform his full range of surgical duties. They also recommended a drug screening because Dr. Martino indicated that Dr. Barber was still taking opiates. Dr. Barber met with the Joint Leadership Council on May 22, where he was asked to undergo a second physical and mental examination that included the assessment of standing

ability, neurocognitive skills, and motor skills, as well as a drug and alcohol screening. Dr. Barber did not express an objection to undergoing an exam by Dr. Ross, and he signed a consent form for disclosure of information and an authorization for release of protected health information form, authorizing Dr. Ross to provide all information relevant to the assessment of his health status and ability to safely practice to USA Health Hospitals and its Leadership Councils, Medical Executive Committees, and the Medical Staff Leadership. Ezelle also provided Dr. Ross with the Medical Staff Health Status Assessment Form and Dr. Barber's privileges checklist for assessment and documentation purposes.

Dr. Barber was seen by Dr. Ross on May 24, 2023. Dr. Barber testified that, in May, he could not stand "for hours" but could stand for an hour, and then had to sit down, although he later told the EEOC in an intake interview in November 2023 that he was unable to stand for more than 20 minutes and needed a cane to assist with walking and balance. Dr. Barber does not recall what questions he was asked by Dr. Ross or what information Dr. Barber shared with him. He recalls that Dr. Ross was okay with Dr. Barber resuming wound care service, but does not recall discussing trauma or surgery with Dr. Ross. Dr. Barber reported in an email to Ezelle and Dr. Chang that Dr. Ross was "fine with [him] returning to wound care/service" and that Dr. Ross "would like to discuss trauma with Dr. Chang." Dr. Barber sent a similar email to Dr. Simmons on May 27, stating that he was "cleared" for wound care, and trauma would have to be discussed with Dr. Chang. Dr. Barber further stated that "Ross does NOT understand the [sic] logistics of our trauma service" but without further explanation.

Dr. Barber testified that he was "very unimpressed" with Dr. Ross because he was a retired neurosurgeon who was no longer practicing, did not do a physical exam of Dr. Barber, and filled

out "some form that was not an acceptable medical document." He also described the exam as "brief" and "superficial," although he cannot recount what he asked of Dr. Ross, and did not speak with him regarding what would be shared with Medical Staff leadership. (And although Dr. Barber was not "convinced" that Dr. Ross was qualified to make a determination, he could not explain his reasoning beyond the fact that he was a retired neurosurgeon who does not practice anymore. Dr. Barber also testified that Dr. Ross "had no idea" what Dr. Barber did as a trauma surgeon, but that they did not discuss this at the meeting and Dr. Barber could not articulate in his deposition how this was significant. Nevertheless, Dr. Barber does not dispute that Dr. Ross concluded that he was not able to perform his duties as a trauma surgeon.

Dr. Ross's written assessment report was prepared on the form provided by the Medical Staff Office for the purposes of obtaining a medical evaluation. It stated that Dr. Barber has "limited mobility and endurance" that could affect his ability to exercise the clinical privileges that he was seeking to have reinstated. Dr. Ross further stated that Dr. Barber's "condition was not suitable for trauma attending, however it is suitable for wound care. Privileges should be considered accordingly." Dr. Ross also stated that Dr. Barber's "condition requires oversight and periodic reconsideration should [his] condition decline," and that, in his opinion, Dr. Barber's privileges should be reduced from trauma attending to wound care only.

Dr. Ross's assessment was consistent with the fact that trauma surgeons at USA Hospital (a Level I trauma center) must perform emergency surgeries on people with critical injuries and illnesses such as blunt force trauma, burns, gunshots, organ failure, etc., and must be able to act and move quickly to access and stabilize the patient by communicating with the critical care staff and other specialists. Trauma call at USA Health, which was a fundamental duty of Dr. Barber's

before his October 2022 surgery, includes covering multiple physical spaces simultaneously, including the operating rooms, ICU, ER, and the floor, supervising all these areas. A trauma surgeon at University Hospital must be able to perform physically stressful surgeries at all hours of the day or night on the patient's chest, abdomen, pelvis, and other areas at the body at a ninety-degree angle, and standing for extended periods of time. The assessment by Dr. Ross and resulting conclusion by the Joint Leadership Council was that Dr. Barber was unable to perform these functions.

The Joint Leadership Council met on June 6, 2023 to discuss Dr. Ross's verbal assessment, which Dr. Chang received from Dr. Ross and shared with the Joint Leadership Council. Dr. Ross's assessment was that Dr. Barber could not meet his trauma and emergency general surgery duties but could perform wound care service duties. The Joint Leadership Council determined that, should the written report by Dr. Ross conform to his verbal remarks, Dr. Barber could not be reinstated to his previous scope of surgical privileges. The written report by Dr. Ross followed shortly thereafter and did conform to his prior remarks.

Dr. Barber spoke with Dr. Chang and Ezelle on June 8, 2023 to discuss reinstatement, and Dr. Chang informed Dr. Barber that, given Dr. Ross's report, he would need to modify his privileges reinstatement request to wound care only. Dr. Barber agreed to modify his reinstatement request to seek only wound care privileges and to delete his trauma service privileges, and he further elected to delete all privileges at Children's & Women's Hospital; this was formalized in a letter from the Joint Leadership Council Chairs to Dr. Barber. Dr. Barber did not object to this plan for him to request reinstatement of his wound care privileges only, or otherwise dispute or challenge the findings by Dr. Ross or the Joint Leadership Council's determination that it would

recommend reinstatement for wound care privileges only. The Joint Leadership Council made a favorable recommendation on his Medical Staff reinstatement pending the completion and approval of the privileges change request. Soon after, Dr. Barber submitted a change request to the Medical Staff office, only seeking privileges related to wound care at University Hospital.

**Dr. Barber's Termination From Employment**

After Dr. Barber elected to no longer pursue reinstatement of his trauma surgery privileges, Dr. Simmons spoke with Fox regarding his need for a trauma surgeon to replace Dr. Barber. Fox also had a series of discussions with legal counsel, the Chief Human Resources Officer, Dr. Chang, Dr. Simmons, and Chair of Surgery Dr. Bill Richards. Fox determined that because Dr. Barber no longer had privileges to perform trauma critical care surgical duties at USA Health, he could no longer work at the facility under his contractual agreement. Given that Dr. Barber was unable to perform trauma critical care services because he no longer had hospital privileges to do so, and that his employment agreement was premised upon him providing those trauma surgery services and maintaining associated clinical privileges, Fox and Dr. Simmons, with the approval of the Vice President for Medical Affairs and Dean of the Whiddon College of Medicine John Marymont and USA Health Chief Operating Officer and Senior Associate Vice President for Medical Affairs Owen Bailey, elected to terminate his employment.

Dr. Barber was notified in a meeting on about June 20, 2023 with Fox, Dr. Simmons, and Charles Smith in USA Health Human Resources that his employment with USA Health was being terminated and was given a written termination letter. Dr. Barber does not remember attending such a meeting, what was said in the meeting, or how he otherwise received the termination letter. According to Fox, Dr. Barber acknowledged that he no longer had hospital privileges for

trauma/critical care surgery but stated that he could maintain his position as Medical Director for the wound care service. In response, Fox told him that USA Health does not have a wound care-only physician position, but if one is created and posted, he would be welcome to apply. USA Health does not have, nor has it ever had, a trauma/critical care surgeon expend their full-time efforts to serve as the wound care medical director. And there is no, and has never been to Fox's knowledge, USA Health physician of any specialty whose sole job duties involve wound care at University Hospital or Children's & Women's Hospital.

Dr. Barber's termination on June 20, 2023 was effective without cause in accordance with the Physician Employment Agreement, providing him with 90-days advance written notice and pay. This provision of the employment agreement allowed USA Health to terminate without cause at any time. Dr. Barber withdrew his request for reinstatement of his wound care privileges later that day.

Per Dr. Barber's interrogatory responses, he has received Social Security Disability benefits, and he also testified at his deposition that he received payments pursuant to two short-term and long-term disability policies. He stated in his interrogatory responses that he has not actively sought employment since his placement on Social Security Disability.

**Additional Facts Provided by Dr. Barber**[2]

The decision to place Dr. Barber in charge of the wound care service was tied in part to challenges with chronic pain that eventually led to his hip replacement surgery. Dr. Simmons was aware of Dr. Barber's health issues and believed that lessening Dr. Barber's physical load would

---

[2] The facts in the section are provided directly by Dr. Barber as an elaboration of the above summary of undisputed fact. *See* also footnote 1. All facts are recited from Doc. 55 with limited non-substantive changes and with internal citations removed.

prolong his career. In the fall of 2022, Dr. Simmons told Dr. Barber that he envisioned that Dr. Barber's role would evolve to the point that running the wound care program would comprise the bulk of his job duties and that surgical duties would make up only about a quarter of his workload. As such, Dr. Barber believed that going forward, roughly 75% of his time would focus on supervision of the wound service program and wound care. Dr. Simmons, who oversaw Dr. Barber's post operative treatment, originally believed that Dr. Barber's condition was so dire that he would never be able to resume his job as a physician and would require long-term disability. While providing support for Dr. Barber's disability application in January 2023, Dr. Simmons composed a cover letter in which he conveyed his conclusion that Dr. Barber was unlikely to "function as a physician again in any capacity". Dr. Simmons shared the cover letter in March 2023 with Dr. Michael Chang, the Chief Medical Officer ("CMO") at USA.

When Dr. Barber communicated to Dr. Simmons in mid-February 2023 that he expected to be able to return to work in March 2023, he only referred to resuming his responsibilities related to wound care service. In response, Dr. Simmons did not inform Dr. Barber that it was untenable for him to perform just the wound care portion of his job. In April 2023, Dr. Barber sent follow up correspondence to Dr. Simmons that "I feel as though I'm ready to return to the wound service." Dr. Simmons did not respond that an exclusive focus on wound care was not feasible. Dr. Simmons forwarded the communication to Dr. Chang, who did not communicate to Dr. Simmons that Dr. Barber's return to wound service alone was not feasible.

During Dr. Barber's exchanges with medical and human resources personnel in the first six months of 2023, and his meeting with the Joint Leadership Council at USA Health in May 2023, the possibility was never raised that returning to work to perform only duties related to the

wound care service would put his employment contract in jeopardy. The occupational health evaluation of Dr. Barber by a third-party physician does not indicate that any actual physical exam was performed, an omission that Dr. Barber could have challenged.

During the June 8, 2023 meeting in which Dr. Chang and Ezelle, a quality and safety director, advised Dr. Barber that his credentials for wound care but not trauma care would be restored, there was no discussion that Dr. Barber's contract might be terminated or that the lack of trauma credentials jeopardized his employment.

The Joint Leadership Council recommended Dr. Barber's reinstatement despite knowledge that Dr. Barber's employment would be restricted to wound care related duties. Had Dr. Barber known that his job was dependent on the restoration of trauma privileges, he would have done one of two things: (1) appeal Dr. Ross' determination; (2) seek a short-term medical accommodation in the form of renegotiation of his contract based on the transition to full time wound care.

During the internal discussions of Dr. Barber's employment in June 2023, Dr. Simmons is "quite sure" that he did not oppose modifying Dr. Barber's position to exclusively focus on wound care. During the meeting in mid to late June 2023 when Dr. Simmons, Dr. Chang, and Chief Physician Enterprise Officer Natalie Fox met to discuss terminating Barber, Simmons acknowledged that there was "definitely" no discussion of the implications of the federal disability discrimination statute, and Fox's testimony is that the subject of whether USA should provide medical accommodations to Dr. Barber did not arise. Fox concedes that there was no review or discussion of Dr. Barber's medical records or the occupational health review during the discussions about his termination.

In addition, during the time frame in which his termination was under consideration, USA officials did not contact Dr. Barber to discuss his prognosis for full recovery. In her deposition, Fox refused to answer whether the decision to terminate Dr. Barber might not have been made if USA had information that Dr. Barber could have resumed his trauma care duties in the next 90 days.  Fox admitted that USA did not make any evaluation of the amount of time Dr. Barber devoted to wound care prior to his surgery and medical leave. There is no indication that USA explored a renegotiation of Dr. Barber's contract consistent with the denial of his privileges to render trauma care.

Dr. Barber's trauma surgery position remained unfilled for approximately 17 to 18 months. USA continued to render high quality patient care during that time. Fox recalled no reports of physicians being burdened because of the demands placed on them for filling the gap caused by Dr. Barber's absence. In early 2023, when it appeared conceivable that Dr. Barber might never be able to return to the trauma unit, USA did not post an opening for a trauma surgery position or recruit to fill the vacancy. While USA waited approximately 8 months into Dr. Barber's absence to post an opening for trauma surgery, his position as wound care director was filled on an interim basis as early as March 2023, after internal concerns were raised that the wound care service was in disarray in Dr. Barber's absence.

## II.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for

trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of

fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 2011 WL 2533755, *2 (11th Cir. 2011). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

## III.    Analysis

To establish a prima facie case of discrimination under the ADA[3], Plaintiff must prove that:

(1) [Plaintiff] is disabled; (2) he was a "qualified individual" at the relevant time, meaning he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) he was discriminated against because of his disability.

*Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001) (citation omitted). An ADA plaintiff may prove a claim for discriminatory discharge by presenting direct evidence of discrimination or through the use of circumstantial evidence. *Wilson v. Gayfers Montgomery Fair*

---

[3] Dr. Barber's claims in this case invoke the Rehabilitation Act, 29 U.S.C.A. § 794(a), which applies to entities like USA that receive federal funding. *See Garrett v. University of Alabama at Birmingham Board of Trustees*, 507 F.3d 1306, 1310 (11th Cir. 2007). In employment cases, the substantive standards for liability under the Act mirror the standards under the employment-based provisions of the Americans with Disabilities Act ("ADA"). 29 U.S.C.A. § 794(d).

*Co.*, 953 F. Supp. 1415, 1421 (M.D. Ala. 1996) (citations omitted).

With regard to circumstantial evidence in ADA claims, the Eleventh Circuit applies the burden-shifting framework, established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Holy v. Clairson Indus., LLC.,* 492 F.3d 1247, 1255 (11th Cir. 2007). Once the plaintiff has proven a prima facie case, the burden shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for its employment action. *See Burdine*, 450 U.S. at 253.  "To satisfy the intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). If the defendant accomplishes this, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's alleged reason or reasons were a pretext for unlawful discrimination. *See Burdine*, 450 U.S. at 253. Alternatively, a plaintiff can survive summary judgment if he presents ... "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citations omitted).  "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn[.]"' *Id*. (citation omitted).

A.     **Dr. Barber is not a Qualified Individual[4]**

1.     **Dr. Barber's trauma/critical care duties were an essential function of his job.**

USA Health asserts that summary judgment is warranted because at the time of his termination, Dr. Barber was not qualified for his position as a Trauma Surgeon. (Doc. 51). More specifically, USA Health contends that Dr. Barber's trauma/critical care duties were an essential function of his job and that his failure to obtain reinstatement of his hospital privileges rendered him incapable of performing those duties. *Id*.

In response, Dr. Barber argues there is a dispute of fact as to whether trauma surgery was an essential function. (Doc. 55). In that regard, while Dr. Barber concedes that his employment agreement required him to "provide professional medical services" within his surgical specialty, he argues the agreement is silent as to the distribution of his workload between clinical care and other roles specified in the agreement that were not encumbered by the reduction of his hospital privileges. (Doc. 55 at 12). Dr. Barber also asserts that USA Health has failed to provide any documentation beyond his employment agreement that elaborates as to the expectations of his role. (*Id*. at 2-13). Further, in an effort to raise a question of disputed fact as to the essential functions of his job, Dr. Barber points out that on several occasions in February, April, and May of 2023 USA Health or its employees/decisionmakers never advised Dr. Barber that his employment was in jeopardy or that his contractual performance was tied to his surgical capabilities. (*Id*.). Dr. Barber also points to the efforts of USA Health to fill Dr. Barber's wound care role, but not his surgical role. (*Id*.) In sum, Dr. Barber contends that the actions of USA

---

[4] The parties agree that Dr. Barber is disabled and that his termination was an adverse action. Therefore, the only dispute is whether he was a "qualified individual."

Health's decisionmakers contradict USA Health's position that trauma surgery was an essential function of Dr. Barber's job and creates a convincing mosaic of evidence from which a jury could infer intentional discrimination.  (*Id*. at 12-16).

A "qualified individual" for ADA purposes is someone with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "An ADA plaintiff must show either that he can perform the essential functions of his job without accommodation, or, failing that, ... that he can perform the essential functions of his job with a reasonable accommodation." *Holly v. Clairson Industries*, L.L.C., 492 F.3d 1247, 1256 (11th Cir. 2007) (citation omitted). "If the individual is unable to perform an essential function of his job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA." *Id*. (citation omitted).

With respect to essential functions, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id*. Courts also consider the testimony of the plaintiff's supervisor. *Id*. at 1257-58. (citations omitted). "Also considered are factors such as the amount of time spent on the job performing the function and the consequences of not requiring the employee to perform the function." *Ivey v. First Quality Retail Serv*., 490 F. App'x 281, 285 (11th Cir. 2012) (citation omitted).

Here, Dr. Barber's employment agreement required him to retain hospital privileges "to perform all services required of this Physician under this Agreement." (Doc. 49-1). There is no

dispute that trauma surgery was one of the services provided by Dr. Barber.  Accordingly, the above language is evidence that from USA Health's perspective, trauma surgery was essential to Dr. Barber's job.

Dr. Barber's position that his communications with USA Health decisionmakers contradict that surgical duties were essential, is uncompelling.  All of the communications to which Dr. Barber refers took place prior to Dr. Barber's hospital privileges not being reinstated.  As a result, none of the decisionmakers involved in those conversations had the benefit of considering the ramifications of events which had not occurred. *i.e.* Dr. Barber's hospital privileges not being restored.  Moreover, Dr. Simmons specifically testified surgical responsibility was an essential role of Dr. Barber's position.  Even considering as fact, Dr. Barber's own contention that surgical duties made up only 25% of his role does not support the same was non-essential. Regardless of whether his employment contract allocated or prioritized his essential duties, the record clearly reflects trauma surgery was *one of* those essential functions.  A failure to specify how much time Dr. Barber would spend performing each of his specific functions, does not support a conclusion that the function is less than essential.  The essential functions of the position for purposes of the Rehabilitation Act is not what is the most important or even the most performed job duty, but rather "those that the individual who holds the job would have to perform." *Holbrook v. City of Alpharetta, Ga.*, 911 F. Supp. 1524, 1527-28 (N.D. Ga. 1995) (quoting 29 C.F.R. Part 1630.2(0), Appendix).

Finally, that USA Health did not immediately hire a replacement to fill Dr. Barber's surgical position does not show a lack of importance or lack of need for the duty to be performed as part of the role. To the contrary, the record reflects that Dr. Barber's trauma surgery duties had to be

22

performed by other surgeons and continue to be performed by other surgeons until Dr. Barber's position was ultimately filled. [5]

Based on a consideration of the above, there is no dispute of material fact that performing trauma surgery was an essential function of Dr. Barber's job.

> **2.    Dr. Barber could not perform his essential functions with or without a reasonable accommodation.**

As an initial matter, there is no dispute that Dr. Barber could not perform surgery without hospital privileges and no dispute that Dr. Barber did not have hospital privileges. Accordingly, there is no dispute that Dr. Barber could perform the essential function of trauma surgery without accommodation. The parties dispute, however, whether Dr. Barber could perform his role with a reasonable accommodation.

USA health argues that Dr. Barber's failed to seek an accommodation and/or never identified a specific reasonable accommodation that he communicated to USA Health (Doc. 51). In response, Dr. Barber contends that USA Health could have reasonably accommodated him "by modifying his contract to permit him to focus on wound care service and administration and/or the teaching component of his position." (Doc. 55 at 19). Dr. Barber then argues that USA Health's actions relieved Dr. Barber of any duty to proactively request an accommodation or served to foreclose a request for accommodation. (*Id*. at 19- 24).

> Although this Circuit has not "determined precisely what form [a request for an accommodation] must take," *Holly*, 492 F.3d at 1261 n.14, other circuits have addressed what qualifies as an adequate request. The Tenth Circuit, for example, has explained that a plaintiff "need not use magic words," but "should provide enough information about his or her limitations and desires [ ] to suggest at least

---

[5] The Court appreciates Dr. Barber's efforts to factually distinguish a number of cases relied on by USA Health. However, considering the factual distinctions pointed out by Plaintiff does not convince the Court of Plaintiff's position for the reasons set forth herein above.

> the possibility that reasonable accommodation may be found in a reassignment job within the company." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999). Similarly, the Third Circuit has held that a plaintiff making a failure to accommodate claim must have provided "enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 314 (3d Cir. 1999).

*Adigun v. Express Scripts, Inc.*, 742 Fed.Appx.474, 476 (11th Cir. 2018).

The Court need not determine whether Dr. Barber requested an accommodation, because even if he did, his proposed accommodation – restructuring his job to not perform surgery – was unreasonable. The Eleventh Circuit has made it clear that the ADA does not require an employer "to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists." *Lucas*, 257 F.3d at 1260; *accord Holly*, 492 F.3d at 1262 n.16 (noting that an employer is not required to eliminate an essential function of the plaintiff's job). To support that restricting Dr. Barber's job to exclude wound care was a reasonable accommodation, Dr. Barber relies on his previous arguments that a question of fact exists as to whether trauma surgery was an essential function. Dr. Barber also argues that USA Health has not demonstrated that altering Dr. Barber's role would result in an undue hardship.[6] As discussed above, however, this Court has determined that performing trauma surgery was an essential function of his job and therefore, elimination the function cannot be a reasonable accommodation.

For the reason stated above, Dr. Barber has not shown that he could perform the essential

---

[6] In this regard, Dr. Baber suggests that altering the job responsibilities might have be temporary in nature and focuses on USA Health's failure to investigate the duration of Dr. Barber's limitations. But Dr. Barber voluntarily withdrew his request for hospital privileges, and he could not perform surgery without privileges. Nevertheless, because the Court finds that the referenced accommodation was unreasonable, it need not address whether it also caused an undue hardship.

functions of his position with or without reasonable accommodation, and, therefore, he has not established that he was a "qualified individual" under the Rehabilitation Act.

### B.    Dr. Barber cannot establish Pretext

Notwithstanding the above analysis, USA Health additionally contends that summary judgment is warranted because it terminated Dr. Barber's employment for a legitimate, non-discriminatory reason and, therefore Dr. Barber cannot establish pretext. (Doc. 51 at 28).   In response, Dr. Barber points to the following facts to show pretext:

> (1) Simmons, while testifying that the purpose of Barber's contract was to provide for a trauma surgeon, did not communicate that view to Barber when he expressed in his February and April 2023 correspondence that he could only return to wound care;
>
> (2) when CMO Chang met with Barber to confirm the restoration of his privileges, he did not indicate that Barber's inability to fully perform his contract was a basis for termination;
>
> (3) Simmons admitted that he did not oppose modifying the terms of Barber's employment to focus on trauma care;
>
> (4) Simmons' pre-leave discussion about shifting Barber to focus on wound care service.

(Doc. 55 at 28).

When a plaintiff establishes a prima facie case of disability discrimination, the burden shifts to the defendant to come forward with legitimate nondiscriminatory reasons for the challenged personnel action. *See Johnson v. Miami-Dade County*, 948 F.3d 1318, 1325 (11th Cir. 2020) ("if the defendant offers a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to the plaintiff to establish that the reason offered by the defendant was not the real basis for the decision, but a pretext for discrimination") (citation and internal quotation marks omitted). Of course, "[a] reason is not pretext for discrimination unless it is shown both

that the reason was false, and that discrimination was the real reason." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018) (citations omitted). A plaintiff may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

Here, USA Health articulated that Dr. Barber's termination was based on a legitimate, nondiscriminatory reason, namely his lack of hospital privileges for trauma/critical care surgery. Plaintiff, then must show the reason proffered is pretextual.

Dr. Barber has not presented any evidence that his medical privileges were not reduced.  As a result, he has not shown that the proffered reason was false.  Moreover, the facts relied on by Dr. Barber to allegedly support pretext do not support the result.  All of the events described by Dr. Barber took place prior to Dr. Barber's withdrawal of his request for hospital privileges. Accordingly, at those moments, there was no reason to assume Dr. Barber's privileges would not be restored, preventing him from performing trauma surgery.  To allow Dr. Barber to assign some motive to the failure to communicate to Dr. Barber something that- at that time- was not under consideration, would be improper to show that his eventual termination was based on anything other than his lack of privileges. In sum, Plaintiff has failed to point to facts which establish a dispute of material fact that USA Health's proffered reason is pretextual.

**IV.    Conclusion**

For the reasons stated herein below, Defendants' Motion (Doc. 51) is GRANTED.[7]

**DONE and ORDERED** this 12th day of November, 2025.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE

---

[7] The parties set forth several arguments which the Court did not address given its determination that Dr. Barber was not a qualified individual under the Rehabilitation Act.  However, as to any positions not specifically addressed in this Order, the Court adopts and incorporates the positions of USA Health as set forth in its motion and reply on those issues. (Docs. 51 and 56).